# UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF OHIO

In Re:

Pejman Hashemi/Carey Sue Hashemi

    Debtor(s)

**JUDGE RICHARD L. SPEER**

Case No. 10-37976

## DECISION AND ORDER

This cause comes before the Court after a Hearing on the Motion of the United States Trustee to Dismiss this case pursuant to 11 U.S.C. § 707(b)(1) and 11 U.S.C. § 707(b)(3). The Debtors filed a response to the Trustee's Motion, objecting to the dismissal of their case. (Doc. No. 13). At the conclusion of the Hearing, the Court deferred ruling on the Motion to Dismiss so as to afford the opportunity to further consider the evidence and arguments submitted by the Parties. The Court has now had the opportunity to review all of the arguments and evidence submitted in this case, and finds, for the reasons set forth herein, that the Motion of the United States Trustee to Dismiss has merit.

## BACKGROUND

On December 2, 2010, the Debtors, Pejman and Carey Sue Hashemi, filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code. "In a Chapter 7 proceeding, an individual debtor receives an immediate unconditional discharge of personal liabilities for debts in exchange for the liquidation of all non-exempt assets." *Schultz v. U.S.*, 529 F.3d 343, 346 (6th Cir. 2008). A Chapter 7 bankruptcy contrasts with other types of relief available under the Bankruptcy Code, such as that set forth in Chapter 13 through which a debtor develops a plan of reorganization to repay all or a portion of their debts.

However, no matter the type of bankruptcy relief sought, it is well-established that a debtor has no constitutionally protected right to receive a discharge in bankruptcy. *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991); *U.S. v. Kras*, 409 U.S. 434, 445–446, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973). Bankruptcy is, instead, a legislatively created benefit that Congress may withhold at its discretion. To that end, Congress has prescribed conditions under which a debtor's bankruptcy case must be dismissed. *In re AC Rentals, Inc.*, 325 B.R. 339 (Table) (10th Cir. B.A.P. 2005). When, as here, a debtor seeks relief under Chapter 7 of the Bankruptcy Code, the conditions mandating dismissal are set forth in § 707.

For its Motion to Dismiss the Debtors' Chapter 7 case, the United States Trustee relies on two provisions set forth in § 707: § 707(b)(1) and § 707(b)(3). These provisions operate in a hierarchical fashion, with § 707(b)(1) first setting forth the foundational requirement, providing for the dismissal of case when abuse is found to exist, and then § 707(b)(3) providing a methodology by which to assess the existence of abuse under § 707(b)(1). In relevant part, these provisions provide:

> (b)(1) After notice and a hearing, the court . . . may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts . . . if it finds that the granting of relief would be an abuse of the provisions of this chapter.
>
> (3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider–
>
> > (A) whether the debtor filed the petition in bad faith; or
> >
> > (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse.

The grant of authority for a court to dismiss a debtor's case under § 707(b) represents a core Congressional policy toward the Bankruptcy Code: that debtors with an ability to repay their debts should not be able to use Chapter 7 to escape their liabilities, but instead should be required to pay, from their postpetition income, all or a portion of their debts. *In re Skvorecz*, 369 B.R. 638, 642–43 (Bankr.D.Colo.2007). To that end, the United States Trustee, in seeking to have the Debtors' bankruptcy case dismissed in accordance with § 707(b)(1) and § 707(b)(3), relied heavily on what it perceived as the Debtors' ability to repay their unsecured creditors. As taken from its Motion: "This [case] should be dismissed because the debtors have the ability to repay their creditors." (Doc. No. 9, at pg. 1). The facts giving rise to this position are largely undisputed.

## FACTS

The Debtors, Ohio residents, have four minor children, ranging in age from 11 years to seven months. In September of 2008, Mr. Hashemi lost his employment and accepted a severance package. For the two years following, Mr. Hashemi, despite active attempts to find a suitable job, remained unemployed. During his period of employment, Mr. Hashemi exhausted his entire severance package; as well, the Debtors depleted all of their savings. During the period in which Mr. Hashemi was unemployed, the Debtors also utilized credit cards to provide for their day-to-day living expenses.

Mr. Hashemi is now employed as a product manager, a position which he has held for approximately seven months. His present job requires a daily commute of at least two hours. Recently, Mrs. Hashemi worked as a respiratory therapist. At the present time, however, Mrs. Heshemi is not employed outside the home, explaining that, while she plans on eventually returning to the workforce, she has chosen at this time to stay at home as part of the process of raising the Debtors' four children.

Pejman Hashemi/Carey Sue Hashemi
Case No. 10-37976

Based upon their present employment situation, the Debtors reported a gross monthly household salary of $8,085.00, or $97,020.00 annually which, after accounting for payroll deductions, nets the Debtors' household $6,946.52 per month. The Debtors did not report any other source of income, except to disclose that they regularly receive tax refunds – *e.g.*, in 2009, the Debtors received a tax refund of $6,549.00, and in 2008, the Debtors' tax refund totaled $6,835.00.

On the other side of the ledger, the Debtors claim that their necessary, monthly expenses total $6,823.06, leaving them with a monthly surplus of $200.92. These expenses included the following expenditures:

| | |
|---|---|
| Mortgage payment: | $2,582.76 |
| Utilities: | $350.00 |
| Water and Sewer: | $70.00 |
| Cell phone and other: | $308.84 |
| Food: | $1,200.00 |
| Clothing: | $100.00 |
| Laundry: | $25.00 |
| Transportation (not including car): | $450.00 |
| Recreation: | $300.00 |
| Life Insurance: | $37.00 |
| Auto Insurance: | $78.00 |
| Car Payment: | $612.00 |
| Replacement Car: | $500.00 |

Page 4

Pejman Hashemi/Carey Sue Hashemi
Case No. 10-37976

    Child Care:                                 $50.00

    Education:                                   $100.00

At the time they filed their petition for relief, the Debtors were insolvent, reporting assets of $263,411.84, and liabilities of $611,792.04. The Debtors' primary asset constitutes their residence which they valued at $244,300.00. Along with their residence, the Debtors reported personal property valued at $19,111.84. The Debtors also disclosed the lease of two vehicles: (1) a 2010 Honda Odyssey Van; and (2) a 2006 Lexus GS 300.

For their liabilities, the Debtors set forth $279,375.64 in secured claims and $332,416.40 in unsecured nonpriority claims. The secured claims disclosed by the Debtors represented two mortgages secured against their residence: a first mortgage valued at $259,375.64; and a second mortgage valued at $20,000.00. Of the unsecured claims disclosed by the Debtors, $180,000.00 represented educational debt.

In their statement of intention, the Debtors reported that they intended to reaffirm the obligations secured on their residence and that, to lower their housing costs, they were exploring the availability of the Home Affordable Modification Program, otherwise known as HAMP. Finally, the Debtors set forth that they intended to assume the lease on their Honda Odyssey, but that they were seeking a replacement vehicle for their leased Lexus.

## DISCUSSION

This matter is before the Court on the Motion of the United States Trustee (hereinafter the "UST") to Dismiss the Debtors' bankruptcy case pursuant to 11 U.S.C. § 707(b)(1) and § 707(b)(3). Matters concerning the dismissal of a case, which affects both the ability of a debtor to receive a

Page 5

discharge and directly affects the creditor-debtor relationship, are deemed to be core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(J)/(O). Therefore, as a core proceeding, this Court has been conferred with the jurisdictional authority to enter final orders in this matter. 28 U.S.C. § 157(b)(1).

Bankruptcy law is intended to give the honest, but unfortunate debtor a fresh start, but not a head start. *In re Hornung*, 425 B.R. 242, 247-48 (Bankr. M.D.N.C. 2010). *See also Duffey v. Dollison*, 734 F.2d 265, 273 (6th Cir. 1984). As a part of this policy, relief under Chapter 7 of the Bankruptcy Code is to be limited to only those debtors truly in "need" of such relief. *In re Krohn*, 886 F.2d 123, 126 (6th Cir.1989). In this case, it is the position of the UST that the Debtors lack a true need for Chapter 7 relief because they have the ability to repay at least a portion of their unsecured debts.

Consistent with the position of the UST, a debtor's ability to repay their unsecured debts has developed to become a prime, and often dispositive consideration when determining whether a debtor is truly in need of Chapter 7 relief, and thus, whether, under the 'totality of the circumstances' standard of § 707(b)(3)(B), a case should be dismissed for abuse. *In re Brenneman*, 397 B.R. 866, 870–71 (Bankr. N.D.Ohio 2008). As observed by the Sixth Circuit Court of Appeals: dismissal for "abuse is intended to uphold creditors' interests in obtaining repayment where such repayment would not be a burden." *In re Krohn*, 886 F.2d 123, 126 (6th Cir.1989) (internal quotations omitted), *citing In re Kelly*, 841 F.2d 908, 914 (9th Cir.1988).

Whether a debtor has the ability to repay their debts is normally ascertained by reference to the amount of "disposable income" the debtor has available, and whether that income could adequately fund a Chapter 13 plan. *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 435 (6th Cir.2004). For purposes of bankruptcy law, the term "disposable income" is defined, generally, as that income received by a debtor which is not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor. *Id.*, *citing* 11 U.S.C. § 1325(b)(2).

Page 6

Pejman Hashemi/Carey Sue Hashemi
Case No. 10-37976

In this matter, the budgetary figures submitted by the Debtors reveal a "disposable income" figure of $200.92 per month. This amount, if devoted to a 60-month Chapter 13 plan of reorganization, would allow the Debtors to pay slightly more than $12,000.00 to their unsecured creditors – a sum equating to just 3½% of their total unsecured debt of $332,416.40. A large part of the Debtors' position regarding their 'need' for Chapter 7 relief stems from this computation which they contend shows an inability on their part to make any meaningful repayment to their unsecured creditors. (Doc. No. 13, at pg. 8).

As a general proposition, low percentage Chapter 13 plans are not favored. *Hart v. Bowers*, 2001 WL 34076355 *2 (C.D.Ill.2001), *citing In re Baker*, 129 B.R. 127, 132 (Bankr.W.D.Tex.1991). Notwithstanding, as applied to § 707(b), "the potentiality of a low percentage Chapter 13 plan will not automatically insulate a debtor from a finding of abuse." *In re Glenn*, 345 B.R. 831, 838 (Bankr. N.D.Ohio 2006). Instead, the germane question in any ability to pay inquiry under § 707(b) is whether a debtor has the ability to make a substantial effort to repay their unsecured creditors. As this Court has explained:

> While it may be true that the higher the percentage of debt a Debtor could pay with future earnings, the more likely it is that a court would find substantial abuse, the converse is not true. Otherwise debtors would be rewarded for having more debt, rather than less. Instead of the percentage of debt, the determination of a debtor's ability to fund a Chapter 13 plan is based on a consideration of the debtor's ability to make a substantial effort in repaying his or her debts.

*In re Wadsworth*, 383 B.R. 330 (Bankr. N.D.Ohio 2007), *quoting In re Praleikas*, 248 B.R. 140, 145 (Bankr. W.D.Mo. 2000). For this purpose, a number of considerations show that the Debtors have the ability to make a substantial effort to repay their unsecured creditors.

Foremost, the 'disposable income' figure of $200.92 per month put forth by the Debtors does not represent a true picture of their ability to repay their creditors. In assessing a debtor's 'disposable

Page 7

income,' this Court has repeatedly stressed that it is not required to accept, at face value, the income and expense figures put forth by the debtor. *See, e.g., In re Slone*, 441 B.R. 274, 278 (Bankr. N.D.Ohio 2010); *In re Gonzalez*, 378 B.R. 168, 173 (Bankr. N.D.Ohio 2007). Rather, in its role as the trier-of-fact, the Court is under a duty to scrutinize a debtor's expenses, and make downward adjustments where necessary, so as to ensure that the debtor's expenses are reasonable. Similarly, when determining a debtor's 'disposable income,' the Court may impute income to the debtor when it would be equitable to do so – *e.g.*, when the debtor is voluntarily underemployed. *Id.*

In assessing their 'disposable income,' it is apparent to the Court that adjustments need to be made to both the income and expense figures put forth by the Debtors. On the income side of the equation, the facts of this case show that the Debtors regularly overpay their taxes, thereby entitling the Debtors to annual tax refunds. Recently, these overpayments have been significant, with the Debtors receiving a 2009 tax refund of $6,549.00 and a 2008 tax refund of $6,835.00.

As applied to § 707(b), where there exists the realistic prospect of future tax refunds, the tax overpayments made by the debtor must be included as a part of a debtor's 'disposable income.' *In re Stimmel*, 440 B.R. 782, 786 (Bankr. N.D.Ohio 2010). In this matter, with no major changes expected to the Debtors' filing status, there is every reason to assume that future refunds will be forthcoming. Moreover, even assuming the Debtors are correct in their assertion that the amount of their future tax refunds will diminish, the underlying principle still remains: Any tax refunds received by the Debtors should be used as a source of income to repay their creditors.

The expense side of the Debtors' budget likewise shows room for economizing. A debtor seeking the protection of the bankruptcy court, while not expected to live as a mendicant monk, is expected to do some belt tightening with their finances. *In re Krohn*, 886 F.2d 123, 128 (6th Cir.1989). In this particular matter, a number of areas of the Debtors' budget cause concern for the Court.

Page 8

First, the Debtors reported the following transportation costs: $612.00 for the lease of a 2010 Honda Odyssey; $500.00 per month to obtain a replacement car for their leased 2006 Lexus; $450.00 for fuel; and $78.00 per month for insurance. Thus, based on these figures, the Debtors claim that they need to allocate at least $1,640.00 per month for their transportation costs. These transportation costs are a significant drain on the Debtors' income, thereby depriving the Debtors' household budget of resources that could otherwise be used to pay unsecured creditors.

This is not to say that the Debtors, in their present situation, can greatly reduce their transportation needs. Mr. Hashemi undoubtably needs a reliable form of transportation to commute to work; likewise, Mrs. Hashemi needs sufficient transportation to ensure that the needs of the Debtors' children are met. However, the allocation of $1,640.00 per month, or almost $20,000.00 per year, for transportation does not resemble the necessary degree of belt-tightening that is envisioned for Chapter 7 debtors. To illustrate, under the 'means test' formula of § 707(b)(2), a household with two vehicles is permitted $1,412.00 in ownership and operating costs.[1] Consequently, without corroborating evidence showing otherwise, the Court is not persuaded that the Debtors must expend the sum of $1,640.00 per month to maintain safe and reliable forms of transportation for their household.

When assessing the Debtors' expenses, the second area of concern for the Court is the Debtors' housing costs. Presently, the Debtors allocate $2,582.76 per month to service two mortgages on their residence, obligations which they intend to assume in their bankruptcy through the reaffirmation process. In addition, as a part of their housing, the Debtors allot $420.00 per month for utilities. The Debtors' housing expenses, thus, total more than $3,000.00 per month.

---

[1] http://www.justice.gov/ust/eo/bapcpa/20101101/bci_data/IRS_Trans_Exp_Stds_MW.htm

Page 9

Pejman Hashemi/Carey Sue Hashemi
Case No. 10-37976

For this geographic area, such an expenditure is simply not required to maintain adequate shelter for the Debtors' family. Again, using the 'means test' as a guideline,[2] a like size household in the Debtors' geographic is only permitted to claim a housing expense of $1,474.00 per month, approximately one-half of the amount claimed by the Debtors.[3]

For this purpose, this Court has not viewed favorably debtors who seek to maintain expensive homes or vehicles while simultaneously seeking to discharge their voluntarily incurred unsecured obligations. In sum, the reaffirmation process in a Chapter 7 bankruptcy was never meant to be used as a device by which debtors could incur large secured obligations to the detriment of their unsecured creditors. *In re Violanti*, 397 B.R. 852, 859 (Bankr. N.D.Ohio 2008). As a result, when faced with a § 707(b) motion to dismiss, a debtor may be expected to forego the reaffirmation of those secured debts which are not reasonably necessary for the maintenance and support of the debtor and his family. *See, e.g., In re Durczynski*, 405 B.R. 880, 884 (Bankr. N.D.Ohio 2009); *In re Wadsworth*, 383 B.R. 330 (Bankr. N.D.Ohio 2007).

The Debtors' argument in response, that their large family and ruined credit makes reaffirming on their home the only viable option, is not supported by the evidence. In particular, the

---

[2] Strictly speaking, the applicability of the 'means test' of § 707(b)(2) is not before the Court. However, as a pole for guidance, the expense figures provided in the 'means test' can be helpful when determining the reasonableness of a debtor's expenses under § 707(b)(3). The underlying goal of both the 'means test' of § 707(b)(2) and the 'totality of the circumstances' test of § 707(b)(3) is the same: to ensure that only those debtors deserving of Chapter 7 relief are afforded its benefits. *In re Edighoffer*, 375 B.R. 789, 792–93 (Bankr. N.D.Ohio 2007), *citing* Hon. Eugene R. Wedoff, Judicial Discretion to Find Abuse under 707(b)(3), 71 Mo. L.Rev. 1035, 1037 (2006).

[3] http://www.justice.gov/ust/eo/bapcpa/20101101/bci_data/housing_charts/irs_housing_charts_OH.htm (Non-Mortgage and Mortgage/Rent expenses for a family of five or more in Lucas County, Ohio).

Pejman Hashemi/Carey Sue Hashemi
Case No. 10-37976

Debtors did not offer any evidence that they could not rent adequate housing for an amount appreciably lower than their present housing costs. There is also a disconnect between the picture the Debtors attempt to paint of frugality while devoting more than $3,000.00 per month to maintain a home valued at approximately a quarter of a million dollars.

The Debtors' picture of frugality is also weak when it is considered that the Debtors allocate $308.84 per month for cell phone and internet service. While contracting to receive such services is not necessarily unreasonable, the question to always ask for these types of expenditures is whether "there exist any less expensive alternatives? Requiring a debtor to make such a showing is not too much to ask. Creditors should not be expected to pay for steak, when hamburger would do." *In re Felske*, 385 B.R. 649, 657 (Bankr. N.D.Ohio 2008). In this case, the Debtors did not offer any viable reason why less expensive alternatives are not available.

The Debtors' ability to make a substantial effort to repay their unsecured debt is also supported by the annual income the Debtors now enjoy, with the most recent figures provided to the Court showing that the Debtors have a household income of $97,020.00 per year. This figure is measurably greater than the median income for a like size household in the state of Ohio which, at the time the Debtors filed for relief, was $86,453.00.[4] Furthermore, as this Court has often remarked: "Under any measure, a debtor, having a stable annual salary of almost $100,000.00, will be hard pressed to establish that they do not have the ability to pay some of their unsecured debt, such as through funding a Chapter 13 plan of reorganization." *In re Beckett*, 442 B.R. 638, 642-43 (Bankr. N.D.Ohio 2010); *In re Brenneman*, 397 B.R. 866, 871 (Bankr.N.D.Ohio 2008); *In re Wadsworth*, 383 B.R. 330, 334 (Bankr. N.D.Ohio 2007).

---

[4] http://www.justice.gov/ust/eo/bapcpa/20101101/bci_data/median_income_table.htm

Page 11

Pejman Hashemi/Carey Sue Hashemi
Case No. 10-37976

The Debtors' final substantive point in support of proceeding with their Chapter 7 bankruptcy concerns their student-loan obligations. At the time they sought bankruptcy relief, the Debtors had $180,000.00 in outstanding educational debt, representing approximately 55% of their total unsecured debt burden of $332,416.40. Given these figures, the Debtors called attention to the reality that any distribution to their general body of unsecured creditors would be reduced. But more importantly, the Debtors argue that, given the size of their educational debts, going forward in a Chapter 13 bankruptcy would impose upon them a significant burden since their student loans, being nondischargeable in character, would continue to accrue interest and other charges during the course of any Chapter 13 plan. It is the Debtors' estimate in this regard that at the end of a Chapter 13 plan, the balance on their student-loan debt would increase to $210,000.00, an amount which they contend will burden them into their retirement years. (Doc. No. 13, at pg. 8).

As an overall matter, this Court has not been receptive to the Debtors' argument that student-loan obligations should be afforded preferential treatment in assessing the propriety of dismissing a debtor's case under § 707(b)(3). In *In re Kaminski*, this Court explained:

> . . . in the context of a § 707(b)(3) action, this Court has not viewed favorably debtors who seek to allocate their financial resources to fully pay a student loan while not doing the same for their other unsecured creditors. The reason: it goes against the core principle of bankruptcy that similarly situated creditors are entitled to an equal distribution of estate assets. The Debtors' position, that payments on student-loan obligations are entitled to special treatment because, being nondischargeable debts, they are not voluntary has been rejected by the Court . . . .
>
> The fact . . . that an obligation to pay a debt will survive bankruptcy, does not, on that basis alone, mean that a debtor has the right to treat the claim differently. Otherwise, all nondischargeable debts would be entitled to favorable treatment, including those debts which arise from a debtor's wrongful conduct – *e.g.*, fraud, embezzlement and larceny. 11 U.S.C. § 523(a)(2)/(4).

Page 12

387 B.R. 190, 197 (Bankr.N.D.Ohio 2008) (internal quotations and citations omitted). *See also In re Reimer*, No. 07–32787, 2008 WL 495537 (Bankr.N.D.Ohio 2008).

At the same time, the Debtors' position cannot be rejected outright. Previously, this Court has held that the 'totality of the circumstances' standard for dismissal under § 707(b)(3)(B) is not conducive to absolutes, and issues presented to the Court must be assessed on a case-by-case basis. *In re Thurston*, Case No. 07–35092, 2008 WL 3414138 *5 (Bankr.N.D.Ohio 2008).

When operating under this approach for student-loans, this Court has denied a motion brought by the UST to dismiss under § 707(b)(3) when at least a couple of conditions were present: (1) there existed a large student-loan obligation which, given its nondischargeable character, would continue to increase in principal during the duration of a Chapter 13 plan; and (2) as compared to the student-loan obligations, the distribution to the debtor's other unsecured creditors would be minimal under a Chapter 13 plan. *Id.* In this matter, however, only the first condition is present.

The Debtors' unsecured debts total $332,416.40, of which only a slight majority, approximately $180,000.00, consists of student-loan obligations. As a result, the second condition is not present because any pro-rata distribution to the Debtors' non-student-loan creditors would be more than a *de minimis* percentage— *e.g.*, approximately 45%. Also, given this condition, the Debtors' concern of having to service their student loans for a substantial period of time does not warrant allowing the Debtors to prefer their student loans since this situation would exist independently of the Debtors' bankruptcy. It is also noted that programs, such as the Income Based Repayment Program, 20 U.S.C. § 1098e, may be available to the Debtors.

In conclusion, the Court finds, for the reasons set forth herein, that the Debtors have the ability to make a substantial effort to repay their unsecured creditors. Consequently, the Court finds the Motion of the UST to Dismiss for Abuse pursuant to 11 U.S.C. § 707(b)(1) and § 707(b)(3) to

Page 13

# CERTIFICATE OF SERVICE

Copies were mailed this 29th day of April, 2011 to:

Carey Sue Hashemi
5238 Kings Run Road
Sylvania, OH 43560

Pejman Hashemi
5238 Kings Run Road
Sylvania, OH 43560

Steven L Diller
124 E Main St
Van Wert, OH 45891

Patti Baumgartner-Novak
3015 Navarre Ave, #203
Oregon, OH 43616

Dean Wyman
201 Superior Ave, #441
Cleveland, Oh 44114

                                                   /s/Diana Hernandez
                                                   Deputy Clerk, U.S. Bankruptcy Court